THE NORTH PACIFIC.

(Circuit Court of Appeals, Ninth Circuit.   February 5, 1900.)

No. 513.

MARITIME LIENS—SUPPLIES—EFFECT OF CHARTER.

> The terms of a time charter of a steamer contained provisions indicating that the venture was to some extent a joint one between the owner and charterers. The owner, who was a member of a firm of shipping agents, was to sell the tickets for passage on the contemplated voyages, and his firm were advertised as agents for the vessel. The office of the charterers was also with such firm, with nothing to indicate that the business was separate. *Held*, that one furnishing to the vessel necessary supplies for the voyage on the order of the master, without either actual or constructive notice of the charter, was entitled to a lien on the vessel therefor, although by the terms of the charter such expenses were to be paid by the charterer.[1]

Appeal from the District Court of the United States for the Northern Division of the District of Washington.

Gorham & Gorham, for appellants.
Metcalfe & Jurey, for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This was a libel brought by C. F. Meyer, F. H. Hardwick, and J. Roberts, as co-partners doing business under the firm name of C. F. Meyer & Co., against the steamer North Pacific, an American vessel, for ship chandlery and supplies alleged to have been furnished by them, at the request of her master, while lying at the port of Seattle, state of Washington, and of which the steamer is alleged to have been in need, and without which, it is alleged, she could not proceed on her voyage. The vessel was at the time under charter; the charter party having been executed January 29, 1898, between John Barneson, W. Mann, and A. W. Horne, as owners of the steamship, and parties of the first part, and Arthur Gamwell, C. W. Thuringer, and Tracy H. Robertson, as charterers and parties of the second part. Barneson afterwards, and before the furnishing of the supplies by the libelants, became sole owner of the boat. The chartering was for the period of four months, to commence on or before February 28, 1898, and was for voyages between Seattle and the ports of Puget Sound and certain Alaskan ports. The charter party contained, among other conditions, the following:

> "(3) The said parties of the first part do engage that the said vessel, in and during said term, shall be tight and stanch for such a voyage or term [as above stated], and shall be well fitted and tackled when delivered. It being understood that the parties of the second part take said vessel as she is at present; parties of the first part agreeing to put in surface condenser, and such machinery as is now contracted for by them. It being understood that there are three boats and one life raft, all to be delivered with the vessel, in condition sufficient to pass the inspection of the United States inspectors."   "(8) The said parties

---

[1] As to maritime liens for services and supplies, see note to The George Dumois, 15 C. C. A. 679.

of the second part do further engage to pay to the said parties of the first part, or their agent, for the charter or freight of said vessel during the term aforesaid, in the manner following: that is to say, at the rate of seven thousand dollars, gold coin of the United States, per month, payable monthly in advance, —money payable in cash, without discount, at Seattle, Washington, as follows: Three thousand dollars to be paid by said second parties to said first parties upon the execution and delivery of these presents; and the further payment of four thousand dollars by said second parties to said first parties upon the delivery of said vessel to said second parties at Seattle as herein provided; and thereafter, thirty, sixty, and ninety days after the delivery of said vessel to said second parties, the sum of seven thousand dollars to be paid by said second parties to said first parties. (8½) It being understood, if the balance of $4,000 of first payment is not made upon the delivery of the vessel, then the said first parties shall retain the sum of $4,000 from proceeds of sale of tickets, all of which is to be left with first parties. (9) It is understood and agreed that said parties of the second part shall, at the termination of each trip at Puget Sound, pay all wages of crew (including captain, at $150 per month, and first engineer, at $125 per month, who are to be named and furnished by said parties of the first part, and both of whom shall be satisfactory to and approved by the second parties), and all port charges from the date this charter commences, and to furnish all necessary ballast, provisions, fuel, oil, rags and waste, water, lights, etc., and all running expenses, towage, wharfage, pilot charges, stevedore charges, etc., during the continuance of this charter. (10) Should said vessel, during the continuance of this charter party, in consequence of disaster from perils of the sea or accidents to boilers or machinery, be compelled to put into any port or ports for repairs, all expenses arising therefrom to be borne by said parties of the first part; nor shall any claim be made on said parties of the second part under this charter party for the time from when said vessel bears away for said port or ports of repair until the voyage (as contemplated under this charter party) is again resumed; but should, at any time, the vessel's boilers require to be cleaned or blown out, the master of said vessel to be allowed to have the same done while said vessel is loading, but free of any cost or expense to said parties of the first part. The acts of God, perils of the sea, barratry of the master and crew, enemies, pirates, thieves, arrest and restraint of princes, rulers, and people, collisions, stranding, and other accidents of navigation excepted, even when occasioned by the negligence, default, or error in judgment of the pilot, master, mariners, or other servants of the ship owners." "(14) It is understood and agreed that said parties of the second part shall have the privilege of making such improvements for passengers or cargo or [as] they may desire, at their own expense; also, to have the privilege of extending bunkers, and otherwise providing said vessel with necessary equipment not now on her, for the carrying of passengers; and said second parties agree to furnish any additional life rafts, boats, life buoys, or life preservers which may be required, all at their own cost and expense; but all such improvements and acquiring of additional equipment as aforesaid shall be subject to supervision and approval of the master of said vessel; such improvements and additional equipment to be taken by said first parties at the expiration of this charter at a valuation of fifty per cent. of first cost." "(17) The said parties of the second part agree to save and hold harmless the said vessel and said parties of the first part from all claims for accidents of any kind to cargo, and from all claims for accidents to, or loss of life of, crew or passengers, or from any claims, demands, and expenditures that may be incurred and contracted for and on account of said vessel by said parties of the second part or their representatives, except as hereinabove provided, and, upon the termination of each trip at Puget Sound, to deliver to said first parties receipted vouchers of all expenditures incurred and [or] discharged up to that date, in default of which on the part of said second parties the said parties of the first part are to have the option of immediately canceling this charter." "(19) In the event of any vessel being salved by said steamer during the terms of this charter, the proceeds to be mutually divided between both parties to this charter party. (20) For the faithful performance of the covenants in this charter to be kept and performed by said second parties,

they hereby agree 'to put up in the hands of said parties of the first part a deposit of seven thousand dollars, to be retained by said first parties during the term of this charter, and until the return of said vessel to said first parties at the expiration of this charter, as herein provided, free and clear of all liens, claims, and demands of whatsoever kind arising from the operation of said vessel by said second parties, said deposit to be made as follows: Upon the execution and delivery of this charter party the parties of the second part hereby agree to place in the hands of said first parties all of the tickets for the transportation of passengers on said vessel to Alaska, to be by said first parties surrendered and delivered to the order of said second parties upon the payment of the passage money therefor, at not less than existing rates for a single passage from Seattle to Alaska; and said parties of the first part are to retain said passage money derived from the sale of said tickets until the amount thereof reaches the sum of seven thousand dollars, which said amount said first parties are to retain during the continuance of this charter as a special deposit for the faithful performance of this charter by said second parties; and, upon the amount derived from the sale of said tickets reaching the sum of seven thousand dollars, then said first parties are to deliver to said second parties all the remainder of said tickets for their exclusive disposal, and in the event of said second parties being unable to pay the charter money in cash, as herein provided, thirty days after the delivery of said vessel as aforesaid, then said second parties are to have the privilege of placing with said first parties all of their tickets for the transportation of passengers from Seattle to Alaska, to be by said parties delivered upon the order of said second parties upon the payment of the passage money therefor, at not less than existing rates for a single passage; said first parties to keep and retain all of the moneys derived from the sale of said tickets until the same has reached the sum of seven thousand dollars ($7,000), the amount due as charter money thirty days after the commencement of this charter, with similar privilege for the payment of the charter money at the expiration of sixty days and of ninety days from the commencement of this charter; in each instance it being understood that said first parties are to return all tickets to said second parties, for their exclusive disposal, when the amount of the sales shall reach the sum of seven thousand dollars; but in each such instance at least seven thousand dollars must be realized from the sale of said tickets on or before thirty, sixty, and ninety days, respectively, from the commencement of this charter; otherwise, this charter party to be forfeited at the option of said parties of the first part."

From these provisions it is apparent that the instrument did not constitute a purely time charter. In truth, it seems in some respects to have been a sort of joint venture between the owners and the charterers. For example, it is provided by the nineteenth article that, in the event of the salving of any vessel by the steamer during the term of the charter, the proceeds should be "mutually divided between both parties to this charter party." And that the instrument contemplated that the owners should retain, during the term of the charter, supervision and control of the vessel, to some extent, is shown by the provisions to the effect that the charterers should have the privilege of making improvements and additions to the boat, which, however, were to be under the supervision and subject to the approval of the master, who, together with the first engineer, was to be named and furnished by the owners, although paid by the charterers, and by the further provision that all of the tickets for the transportation of passengers should be placed with the owners, and the proceeds of the sale of the same retained by them, not only until the full amount of the charter money should be paid, but until an additional sum of $7,000 should accumulate therefrom in their

hands as security for the return of the vessel to the owners free and clear of all liens, claims, and demands of whatsoever kind arising from the operation of the vessel by the charterers. This last provision, together with the provision to the effect that at the termination of each trip at Puget Sound the charterers should pay the crew, including all "running expenses," etc., seems to indicate that it was contemplated by the parties to the instrument that the charterers were to conduct the voyages, in part, at least, upon credit. It is not claimed that the libelants had any constructive notice of the charter party, and although Barneson, in his testimony, states that he gave Meyer, one of the libelants, and Chilcott, in his testimony, states that he gave Pingree, the soliciting agent of the libelants, actual notice that the steamer was under charter, and that the charterers had to supply her with necessaries, those statements are specifically denied by Meyer and Pingree. We think the circumstances of the case not only confirm the testimony on behalf of the libelants in that regard, but are also of opinion that the circumstances were such as not to put the libelants upon inquiry as to the charter party or its terms. The preponderance of the evidence is to the effect that Barneson himself ordered the 300 life preservers, constituting the first item of the libelants' bill of supplies. Prior to the furnishing of any of the supplies by the libelants, it appears that Barneson had become the sole owner of the steamer. He was a member of the firm of Barneson & Chilcott, shipping agents at Seattle, which firm was advertised as agents for the steamer North Pacific. In the inner office of that firm, and within a few feet of the desks of Barneson and Chilcott, Gamwell, one of the charterers, had a desk, over which was a sign reading either, "Office of the Steamer North Pacific." or, "Office of the North Pacific Company." There was, so far as appears, nothing in the surroundings to indicate that Gamwell was conducting any business for this steamer, or any other business independent of the firm in whose private office he was. It was to this office of Barneson & Chilcott that the libelants sent their solicitor to get the business of supplying the vessel. Chilcott referred him to Gamwell, and Barneson admits that he also spoke to Gamwell in behalf of the libelants. Most of the articles were ordered by the master of the steamer North Pacific directly, or through the engineer, and all of them for which the decree of the court below was rendered were received by him without any actual notice to the libelants of the charter party; and, the circumstances of the case being such as not to put the libelants upon inquiry as to its existence, we think the judgment should be affirmed. It is so ordered.